Rosalia Nick, Appellant, v. Joseph F. Nick, Executor, et al., Appellees.

**WILLS:** Grounds for Revocation. An election by a widow to accept the provisions of her husband's will in her behalf in lieu of her distributive share, induced by fraud, or by mistake, or by lack of intelligent understanding, or by undue insistence of those selfishly situated, should be revoked by the court on the reasonably prompt application of the widow prior to the expiration of the statutory period—60 days—for making the election, provided other parties have not changed their position by relying on said election; and the grounds for such revocation need not be established to the extent necessary in applications to revoke contracts, deeds, and like instruments.

*Appeal from Iowa District Court.*—Ralph Otto, Judge.

September 26, 1922.

Suit in equity, to cancel plaintiff's election to accept the benefits provided by the will of her deceased husband, Joseph Nick. The material facts are stated in the opinion. There was a decree for the defendants, and plaintiff appeals.—*Reversed.*

*Johnson, Donnelly & Lynch* and *Havner, Hatter & Harned,* for appellant.

*Dutcher, Davis & Hambrecht,* for appellees.

Weaver, J.—Joseph Nick, a resident of Iowa County, Iowa, died testate, September 2, 1920, leaving an estate of the value

of about $90,000. He was survived by his wife, Rosalia Nick, 82 years of age, who is plaintiff herein, and by five children: Joseph F., who is the executor of the will, Mary T., Anna R., Caroline V., and Helen B., who are the appellees. The testator and plaintiff were married in 1874, and lived in that relation until the death of the husband, 46 years later. The appellees are all children of this marriage. The plaintiff had been married before, and was the mother of other children, bearing the family name of Schuler. These children were all young at the time of her second marriage, and became members of the testator's family, and grew up with him until going out to homes of their own. The will devised to the plaintiff a.life estate in the real property, consisting of a farm of 255 acres and a homestead in the town of Marengo, Iowa. It also provided legacies of from $500 to $900 each to his stepchildren, and some additional gifts to others, and devised the residue of his property, including the remainder after the wife's life estate, to his five children above named. The will was duly admitted to probate. On September 30, 1920, four weeks after the death of the testator, the plaintiff, at the solicitation and request of her son Joseph F. Nick and his counsel, signed a written election to accept the provision of the will in her behalf, which election was on the following day filed in the office of the clerk of the district court. At about the same time, or very soon thereafter, she signed a petition for widow's allowance for a year's support, in which she stated that she had elected to accept the terms of the will. This application was also prepared by counsel for her son Joseph F. Nick, and was granted by the court in the sum of $1,800, under date of October 5, 1920. Thereafter, on October 13, 1920, plaintiff, having employed independent counsel, filed a writing in the probate proceedings, declaring that she had revoked her election to take under the will, as having been procured from her against her will and without her consent and by misunderstanding of her legal rights, and declared her refusal to take under the will, and her election to take the benefit of the rights secured to her by statute. On the motion of the defendants, and by consent of the parties, the proceeding was transferred from the probate to

the equity calendar. The defendants, answering the petition, denied all charges of fraud and undue advantage, and alleged that, by her act in applying for and obtaining an allowance for support, she is estopped to deny or withdraw her election or to demand a statutory share in the estate of her husband. Some other matters are pleaded, concerning which no evidence has been offered, and we omit further reference thereto. As is usual in cases of this character, there is considerable sharp conflict in the testimony offered; but, in our opinion, there is enough which is admitted or well proved to establish the essential rights and equities of the respective parties.

For nearly half a century, plaintiff was the wife of the testator, who, with her help, had accumulated an estate of substantially $90,000, subject to merely nominal indebtedness; and upon his death, the widow became entitled by statute to one third thereof, which, with her legitimate allowances for exemptions and support, would aggregate at least $30,000. On the other hand, considering her age and short expectancy of life, the estate given her by the will was, at best, worth only a small fraction of that sum; and if her choice was to be governed by the motives which ordinarily affect human conduct, she would be expected to renounce the benefits of the will and take advantage of the statute. Out of deference to the fact that the average woman, when widowed, is ordinarily inexperienced in business, and is liable to be embarrassed between her sense of loyalty to the wishes of her deceased husband and her desire to deal fairly by her children, the law has allowed her six months in which to reflect and to inform herself as to her rights and decide between the alternatives with which she is confronted. Her election, when made and filed, is in no sense a contract, nor is the record of it in any sense an adjudication. It is, however, just what it is called,—an "election or choice" between the benefits offered by the will and those provided by the statute; and when fairly and intelligently made, and so acted upon by the parties in interest that it cannot be withdrawn without prejudice to others who have acquired intervening rights in reliance thereon, it becomes irrevocable. Where, however, the choice has been made improvidently, without due understand-

ing of its effect, or under the influence of material mistake of
fact or of law, or by undue pressure or influence exerted by
others, and especially where it is made very soon after the death
of the testator, the widow, acting with reasonable promptness,
may renounce and withdraw her election. *Wohlers v. Griesse,*
179 Iowa 629; *Macknet v. Macknet,* 29 N. J. Eq. 54; *Garn v.
Garn,* 135 Ind. 687 (35 N. E. 394); *Dudley v. Pigg,* 149 Ind.
363 (48 N. E. 642); *In re Estate of Dunphy,* 147 Cal. 95;
*Koonce's Appeal,* 4 Walker (Pa.) 235; *Richardson v. Justice,*
125 N. C. 409 (34 S. E. 441); *Evans' Appeal,* 51 Conn. 435; *In
re Woodburn's Estate,* 138 Pa. St. 606 (21 Atl. 16); *In re
McFarlin,* 9 Del. Ch. 430 (75 Atl. 281). The foregoing are by
no means all the precedents upon this question, but are enough
to indicate the universal trend of the authorities. The general
rule is well stated in the *Garn* case, supra, where, after noting
that, under a statute like our own (Code Section 3376), an ac-
ceptance of the terms of a will is conclusively presumed, at the
end of the statutory period, without an election to take a dis-
tributive share, the court proceeds to say:

"An affirmative election to accept the provisions of the will
adds nothing to the force of the statute. Therefore, any act
which will preclude the exercise of that privilege which is given
expressly by the statute must be of such force and effect as to
constitute an estoppel. Here, the act done is induced by the
appellant; the doing of the act [the execution of a written elec-
tion] does not mislead anyone; no interests attach on the faith
of the act; nothing is parted with by those who would receive
benefits from the act; innocent parties are not made to suffer
from the act; no advantage is received or retained by the widow
as the result of the act. Essential elements of an estoppel are
absent, as a question of pleading and as a question of evidence.
* * * Where the elements of an estoppel are absent, and where
it is evident that the election is not the result of a reasonable
understanding of the effect of the act, and where the act is
sought to be revoked within the statutory period for the exer-
cise of the election to take under the law, such revocation should
be permitted."

In the same opinion, the court further says that the rule

permitting such revocation "applies with especial force where the widow is called upon * * * to make her election shortly after her husband's death."

The same rule is affirmed in like terms by the Pennsylvania court in *In re Woodburn's Estate,* supra, where the widow was permitted to withdraw her election, which had been made in writing, signed, sealed, and filed, and there was neither allega-- tion nor proof that she had been intentionally deceived or misled.

So in the *Macknet* case, supra, where the election was made under the mistaken advice of counsel. The court there says:

"She had a right to know the probable consequences of her dissent, and if she was misled on that score, and discovered her error while yet there was time to retract the dissent, and made speedy application for leave to do so, she ought to be placed *in statu quo,* unless the situation has so changed since her election that it cannot be done without prejudice to the subsequently acquired rights of others."

In practically all of the cited cases, the right of the widow to retract an election made under a material mistake or misunderstanding is strongly affirmed, subject only to the condition that she act promptly within the statutory period allowed for an election, and before the acquirement of intervening rights by others who have acted in good faith, in reliance upon her election. This rule we have ourselves expressly approved in *Wohlers v. Griesse,* supra.

Coming back now to the record before us, the simple question is whether the widow in this case has made a sufficient showing for relief, under the doctrine of the cited cases. Of this we think there can be no substantial doubt. In the first place, it is quite clear that she was induced to execute the written election by the insistence of her son Joseph, who was anxious to exclude the possibility that the Schuler children might, in the future, acquire an interest in the property through the mother, if she should exercise her right to take under the statute. In this he was, to some extent, aided by the daughter Mary, who was the only member of the family then living at home with plaintiff. To this end, and within less than a month after the testator's death, Joseph sought to commit the plaintiff to an

acceptance of the will, and the matter was the subject of consultation with his counsel. At his request, counsel prepared the written election to take under the will; and armed with this paper, and accompanied by counsel, he visited the mother in her home. He testifies that he had had a previous talk with his mother, and had obtained her promise or assurance that she would take under the will. This she denies; but whatever be the truth in that respect, it is conceded that he did visit his mother, bringing with him his counsel; and that, when they had made known their purpose, plaintiff objected to the signing of the paper, saying that she wanted time to think it over, and to consult with some of her friends. Thereupon, the lawyer returned to his office. What immediately followed the withdrawal of counsel is the subject of dispute, but it is admitted that the subject of the proposed election was discussed with some degree of heat. In that talk, Joseph said to plaintiff that, if she insisted upon her share under the law, the farm would be sold, and said that her third "would be made mighty small." He did not tell her that she could have her third set off to her in the land, but repeated that, if she did not take under the will, the land would be sold. We quote the following from his cross-examination:

"Q. You gave her to understand that, if she decided to accept the statutory third as her right, the result would be the sale of the farm, didn't you? A. Yes, sir. Q. And she told you she didn't like to see the farm sold, and didn't want it sold, didn't she? A. She said, 'I don't want the farm sold.' Q. Didn't she tell you, in substance, rather than see her interest in that farm disposed of, she would sign the paper, if the result was going to be she would have a sale of her interest? A. Yes, sir."

During this talk, according to plaintiff, her daughter Mary threatened to leave home, and further told her:

"If you don't take under the will, we will sell the farm, and everything will be thrown out in the road."

Mary, though in court, did not testify in denial of her mother's version of the story. The result of the talk between the mother and her son and daughter was that, after the lawyer had been gone only about twenty minutes, he was recalled by

Joseph, who informed him over the phone that plaintiff was ready to sign the paper. Responding to this call, counsel returned, and the paper was signed. This was done late in the evening. Early the following morning, the old lady appeared at the office of the lawyer, saying to him that she was afraid she had made a mistake in signing the paper, and asked him not to file it until she had a chance to talk with some of her friends; and to this he consented. Among other things, she expressed a desire to see Mr. Vette, the banker with whom she had done some business. Mr. Vette, who is the father-in-law of the attorney for the executor, did call upon her that afternoon. As a witness, he says that plaintiff expressed her personal satisfaction with the will, but that she feared the Schulers might make her trouble. He further says that she expressed her willingness to make the election if she could get a satisfactory widow's allowance in her behalf, and asked him to see the lawyers about it. Thereupon, he reported to the counsel for the executor, who prepared the application for the allowance hereinbefore mentioned. This paper Vette took to the plaintiff, who signed it. The paper being executed, counsel, without having any further personal interview with plaintiff, filed both papers with the clerk. As a witness, the plaintiff explains her act in signing the election to take under the will by saying that, the attorney having left after his first call, "my son Joe came alone and talked and talked until he got me rattled and nervous, and I did sign."

That under the circumstances, even as related by Joseph himself, this old mother, burdened with the weight of years, called upon to take a step of such importance so soon after the death of her husband, and intensely anxious to deal fairly with all her children, should become "rattled and nervous," and unfitted to act with the deliberation and judgment which ought to be exercised in such a transaction, is not at all strange. Of itself, this situation may well justify the court in allowing a withdrawal of the election, even without evidence affirmatively showing fraud or misrepresentation; but this record is not without showing of mistake and lack of intelligent understanding on the part of the widow. The attorney who prepared the writ-

ten election testifies that, when he visited the home of the plaintiff and presented the paper for her signature, he informed her that, while there was no haste in the matter, and she could have all the time she wanted, "it was necessary, when she made up her mind what she wanted to do,—whether she would take under the will,—it was necessary to sign a paper and file it of record,—it would state that fact;" and that he further told her, "it was the duty of the executor, in the event she did not voluntarily elect, they could serve a notice on her, requiring her to elect or reject." He also advised Joseph of the "necessity of there being an election by the widow as to whether she would take under the will or not." That such information was honestly given, and without any purpose to mislead the woman, is to be readily conceded. Indeed, the argument of appellees in this court assumes the same legal proposition. It is, however, a mistaken construction of the statute; a mutual mistake, by which both parties appear to have been influenced in the execution and procurement of the paper. The making and filing of a written election is in no manner necessary to determine or fix the widow's right to take under the will. Generally speaking, a duly executed written election *is* necessary to *renounce* the will and take under the statute; but, the statutory notice having been given, an *acceptance* of the will is conclusively presumed at the end of the statutory period, in the absence of any election to take a distributive share. Code Section 3376; Acts of the Thirty-eighth General Assembly, Chapter 192. To take under the will, the widow, having been duly notified, has only to hold her peace, and refrain from any election to take under the statute. The fact that the plaintiff was by this mistake impressed with the idea that she was under legal necessity to make a formal written election, and that the executor evidently believed he had the legal right to demand it, doubtless thus precipitated the action taken, and may have led the plaintiff into an act contrary to her best interests,—an action which she would not have taken, had she been left free from pressure by members of the family having a selfish purpose to serve in hastening her to a premature decision or choice. Plaintiff further claims to have been influenced by a statement by Joseph or his coun-

sel that, if she took the life estate, she would not be required to pay taxes on the property. Both Joseph and the lawyer deny making the representation. It appears, however, that the matter of taxes was spoken of between them, and we think plaintiff did believe that, by taking the life estate, she would be relieved of the taxation of the land. This may have been the result of her misunderstanding, and not because of any misrepresentation by the executor or his counsel; but the fact of her misconception of the effect of her election is the material consideration in passing upon her right to withdraw it.

In disposing of the case, it is but fair to say that nothing herein is intended as a reflection upon the good faith or professional conduct of appellees' counsel in this matter. He appears to have treated the plaintiff with entire courtesy, explaining to her the nature and extent of her right to choose between the benefits of the will and those secured to her by statute. But, granting all this, it is very clear that the election was procured under circumstances which call for equitable interference in the widow's behalf. Counsel for appellees is mistaken in classing this case with those for canceling deeds or contracts duly executed. Says the Delaware court:

"The fundamental idea of an election is that of a designed choice of one thing rather than another, and the selection cannot be made satisfactorily when there is, at the time, a misconception of the rights between which the choice is made. This feature marks a line of distinction between mistakes in making elections from other mistakes; and with good reason a more liberal rule prevails in granting equitable relief from the latter than from the former." *In re McFarlin,* 9 Del. Ch. 430 (75 Atl. 285).

See, also, 1 Pomeroy's Equity Jurisprudence (3d Ed.), Section 512.

In *Evans' Appeal,* 51 Conn. 435, the widow was allowed to retract her election because she had been incorrectly advised as to her rights.

In *Dudley v. Pigg,* 149 Ind. 363 (48 N. E. 642), the authorities are quite fully considered, and it is there held that the widow's right to elect to take under the law within the time fixed

by statute "cannot be barred, except by such conduct as will constitute an estoppel." This was said in a case where the widow had, in fact, executed an election to take under the will. Indeed, in practically every authority we have cited, the withdrawal of an election between a will and a statutory right has been sustained upon proofs which would be insufficient to set aside a deed or contract.

In this case, there is no evidence on which to base a claim or plea of estoppel. Plaintiff acted very promptly in renouncing the election, and in declaring her subsequent election to take under the statute. No person or party was thereby induced or led to take action in reliance upon such election. There are no intervening rights acquired by others which suffer prejudice thereby. The books disclose no authority or decision upon which this decree can stand. The decision in *Ashlock v. Ashlock*, 52 Iowa 319, on which appellees largely rely, is not in point. The sole proposition there determined was that a former decree entered by the court at the suit of the widow had the effect to adjudicate her acceptance of the terms of the will, and that, no appeal having been taken therefrom, she was bound by such former adjudication.

Some point is made by the appellees that plaintiff's application for allowance for support money operates as a waiver of her right to take under the statute, and a confirmation of her election to take under the will. · Her right to the allowance was in no manner dependent upon her choice between the benefits provided by the bill and those given by the statute (*Hamilton v. Hamilton*, 148 Iowa 127) ; and such being the case, her act in asking for and procuring the allowance operates neither as a waiver nor an estoppel to defeat her right to elect to take under the statute. It is said, however, that, in such application, she stated to the court that she had elected to take under the will, and that she ought not now to be heard to deny or withdraw the admission. As the fact whether she had or had not elected to take under the will was immaterial, it cannot be presumed that it influenced the action of the court in making the order, nor could its subsequent denial operate to prejudice the rights of the appellees. Moreover, the application was framed

by the executor or his counsel, as a part of the same transaction by which the election to take under the will was obtained, and adds nothing whatever to the strength of the defendants' case, as against the plaintiff's showing that the election was obtained from her under circumstances entitling her to equitable relief.

In our judgment, the showing made quite clearly estab-lishes her right thereto. The decree appealed from is reversed, and cause will be remanded for the entering of a decree setting aside and vacating the entry of plaintiff's election to take under the will of her husband, and confirming her right to her statutory share in his estate.—*Reversed and remanded.*

STEVENS, C. J., PRESTON and DE GRAFF, JJ., concur.